J-A30024-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.N. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.N., BIOLOGICAL | : | |
| FATHER | : | No. 1182 WDA 2017 |

Appeal from the Decree June 21, 2017
In the Court of Common Pleas of McKean County
Orphans' Court at No: No. 42-17-0062

| | | |
|---|---|---|
| IN THE INTEREST OF: M.N. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.N., BIOLOGICAL | : | |
| FATHER | : | No. 1183 WDA 2017 |

Appeal from the Decree June 20, 2017
In the Court of Common Pleas of McKean County
Orphans' Court at No: 42-17-0061

BEFORE: BOWES, J., STABILE, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY STABILE, J.: **FILED FEBRUARY 15, 2018**

A.N. ("Father") appeals from the decrees entered June 20, 2017, and June 21, 2017, in the Court of Common Pleas of McKean County, which involuntarily terminated his parental rights to his minor children, M.N., a male

born in June 2010, and L.N., a female born in June 2009 (collectively, "the Children").[1]  After careful review, we affirm.

We summarize the relevant factual and procedural history of this matter as follows.  McKean County Children and Youth Services ("the Agency") obtained emergency custody of the Children in February 2016, after Mother's minor daughter from a prior relationship accused Father of sexual abuse.  N.T., 5/15/17, at 22-25, 30.  The Children remained in foster care until the trial court returned them to Mother in March or April 2016.  *Id.* at 30, 52.  However, the court removed the Children and placed them in foster care a second time in May 2016.  *Id.*  The court adjudicated the Children dependent on July 15, 2016.  Exhibit Agency 1 (dependency orders).

Currently, Father is incarcerated in a state correctional institution after pleading guilty to indecent assault.  N.T., 5/15/17, at 67, 78.  Father was found to be a sexually violent predator, and is required to register as a sexual offender for the remainder of his life.  *Id.* at 78-79.  Father's minimum release date is in August 2018, while his maximum release date is in February 2021.  Stipulation (L.N.), 4/24/17.

On March 23, 2017, the Agency filed petitions to terminate Father's parental rights to the Children involuntarily.  The trial court conducted a termination hearing on May 15, 2017.  Following the hearing, on June 20,

---

[1] H.S. ("Mother") relinquished her parental rights to the Children voluntarily. Mother did not file a brief in connection with this appeal, nor did she file her own separate appeal.

2017, the court entered a decree terminating Father's parental rights to M.N.

The court entered a decree terminating Father's parental rights to L.N. on June

21, 2017.  Father timely filed notices of appeal on July 18, 2017, along with

concise statements of errors complained of on appeal.[2]

Father now raises the following issues for our review.

[1.] Whether the trial court erred in finding that the evidence admitted at trial was sufficient to support an involuntary termination of parental rights?

[2.] Whether the trial court's application of an *ex post facto* law to support the involuntary termination of parental rights is unconstitutional?

Father's Brief at 4 (suggested answers and trial court answers omitted).

_____

[2] The record reveals that Father filed his notices of appeal and concise statements on July 18, 2017, but that the McKean County Register of Wills/Clerk of Orphans' Court covered the original time-stamps with correction tape and time-stamped the documents for a second time on July 28, 2017. On August 22, 2017, this Court received an e-mail from an employee at the Register of Wills/Clerk of Orphans' Court, indicating that the original time-stamps were "whited out because the Praecipe for In Forma Pauperis Order was not approved.  Once the Order granting In Forma Pauperis was signed by the judge, we time-stamped the Notice of Appeal and Statements of Errors Complained of on Appeal."  E-mail, 8/22/17.  Although the e-mail indicates that Father requested *in forma pauperis* status on July 18, 2017, his praecipes to appeal *in forma pauperis* are dated and time-stamped July 19, 2017.

We note that Father timely filed his notices of appeal on July 18, 2017, even though he failed to request *in forma pauperis* status until the next day and, presumably, failed to pay the requisite filing fee.  It is well-settled that "[a]n appeal filed within the allowed time period without the requisite fee will still be considered valid."  ***See First Union Nat. Bank v. F.A. Realty Investors Corp.***, 812 A.2d 719, 723 (Pa. Super. 2002).  If an appellant delays in paying a filing fee, or in seeking *in forma pauperis* status, this Court may exercise its discretion to dismiss the appeal.  ***Id.***  Here, Father's counsel acted promptly by requesting *in forma pauperis* status on July 19, 2017.  Therefore, we decline to dismiss this appeal.

We review Father's issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), (11), and (b). We need only agree with

- 4 -

the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provides as follows.[3]

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

---

[3] Father's second issue on appeal, in which he contends that the trial court applied an *ex post facto* law in violation of his constitutional rights, applies to Section 2511(a)(11). Because we conclude that the record supports the court's decision to terminate under Section 2511(a)(2), we need not address Section 2511(a)(11) or Father's constitutional challenge.

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). Importantly, "a parent's incarceration is relevant to the section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted).

Instantly, the trial court found that Father is incapable of parenting the Children, and that he cannot, or will not, remedy his parental incapacity. Trial Court Opinion (L.N.), 6/19/17, at 8-9. The court emphasized Father's incarceration, his lengthy criminal history, his history of substance abuse, and his mental health issues. *Id.* at 8. The court also expressed concern that Father will have limited employment opportunities upon his release, that he

may not complete sexual offender treatment successfully, and that he may commit additional crimes. *Id.*

In response, Father argues that he does not have a lengthy prison sentence, and that he is participating in programs that will allow him to find employment upon his release. Father's Brief at 28-29. Father argues that he has done everything that the Agency asked him to do, and that he utilized all available resources to maintain contact with the Children. *Id.* at 28-30.

Our review of the record supports the trial court's findings. During the termination hearing, the Agency presented the court with documents detailing Father's extensive criminal history, which the court admitted into evidence as Exhibits Agency 2 through Agency 9. Father's criminal history dates back to 2003, and includes convictions for corruption of minors, underage drinking, furnishing alcohol to minors, possession of marijuana, possession of drug paraphernalia, conspiracy to commit theft, criminal mischief, simple trespass, and aggravated assault. Exhibit Agency 2-7. Father also has a prior conviction for indecent assault, which resulted from an incident unrelated to his sexual abuse of Mother's daughter.[4] Exhibit Agency 8-9.

Concerning his more recent conviction for indecent assault, Father testified that he was arrested and charged in February 2016, and that he has remained incarcerated ever since. N.T., 5/15/17, at 77-78. Father pled guilty,

_____

[4] This incident took place in March 2015, and Father was charged in April 2015. Exhibit Agency 8. Apparently, Father was out on bail at the time he was arrested for sexually abusing Mother's daughter. A jury convicted Father in March 2016. *Id.*

and the case is currently on appeal. *Id.* at 78-79. Father explained that he is appealing only the finding that he is a sexually violent predator, and that he is not attempting to withdraw his guilty plea, at least "[n]ot yet." *Id.* The parties stipulated that Father's minimum release date is August 2018, while his maximum release date is February 2021. *See* Stipulation (L.N.), 4/24/17.[5]

Concerning his history of drug use, Father acknowledged that his parole was revoked in 2012, after he tested positive for marijuana and cocaine. N.T., 5/15/17, at 79-81. Father claimed that he and Mother "smoked one joint that had a little cocaine on it and that was it and [the Children] were sleeping." *Id.* at 81. Father further acknowledged that he "admitted to Adult Probation" that he used Vicodin in 2012, although he claimed that he only took one pill, and that he needed it to "go to work." *Id.*

The trial court also heard the testimony of the Children's paternal grandmother, R.N. ("Paternal Grandmother"). Paternal Grandmother testified that Father used marijuana since he was approximately seventeen years old, and that he is now thirty-two years old. *Id.* at 90, 98. She recalled that Father would sometimes "be good for 2-3 years and then kind of have a . . .

_____

[5] During the termination hearing, the trial court ordered the parties to reach a stipulation as to Father's minimum and maximum release dates, but the parties failed to do so by the close of testimony. The certified record on appeal contains stipulations dated May 15, 2017, the same day as the hearing. Oddly, the stipulations are time-stamped as being filed on June 21, 2017, but the original time-stamps are once again covered with correction tape, and the date of April 24, 2017 is written over them in pen. The stipulations could not have been filed on April 24, 2017, given that the parties had not yet reached a stipulation by the conclusion of the May 15, 2017 hearing.

little falling back and stuff." ***Id.*** at 98. Paternal Grandmother theorized that Father's drug use might be his way of attempting to self-medicate his mental health issues. ***Id.*** She testified that Father was diagnosed with attention deficit hyperactivity disorder when he was nine years old, and with bipolar disorder when he was twelve years old. ***Id.*** at 92.

Thus, the record confirms that Father is incapable of parenting the Children, and that he cannot, or will not, remedy his parental incapacity. As the record reveals, Father has a significant criminal history, as well as a history of substance abuse and mental health issues. Most troublingly, Father pled guilty to sexually abusing Mother's minor daughter, resulting in one of his two convictions for indecent assault. Father's history as a repeat sexual offender, and particularly his status as a sexually violent predator who has targeted a young child, indicates that he may pose a risk of harm to the Children if they are ever returned to his care.

Moreover, Father has been incarcerated continuously since February 2016, and it is not clear when he will be released. Even assuming that Father is released at the earliest possible opportunity in August 2018, he will be unable to resume performing parental duties for the foreseeable future. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope

for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super.
2006).

We next consider whether the trial court abused its discretion by
terminating Father's parental rights pursuant to Section 2511(b).

> Section 2511(b) focuses on whether termination of parental rights
> would best serve the developmental, physical, and emotional
> needs and welfare of the child. As this Court has explained,
> Section 2511(b) does not explicitly require a bonding analysis and
> the term 'bond' is not defined in the Adoption Act. Case law,
> however, provides that analysis of the emotional bond, if any,
> between parent and child is a factor to be considered as part of
> our analysis. While a parent's emotional bond with his or her child
> is a major aspect of the subsection 2511(b) best-interest analysis,
> it is nonetheless only one of many factors to be considered by the
> court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can
> > equally emphasize the safety needs of the child, and
> > should also consider the intangibles, such as the love,
> > comfort, security, and stability the child might have
> > with the foster parent. Additionally, this Court stated
> > that the trial court should consider the importance of
> > continuity of relationships and whether any existing
> > parent-child bond can be severed without detrimental
> > effects on the child.

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting

***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and

citations omitted).

Here, the trial court found that terminating Father's parental rights
would best serve Child's needs and welfare. Trial Court Opinion (L.N.),
6/19/17, at 9. The court reasoned that the Children are bonded with their
foster mother, and are excelling in her care. ***Id.*** The court found that the

Children also share a bond with Father, but that this bond is "more limited" due to the passage of time, and is outweighed by the benefits of adoption. *Id.*

Father contends that the trial court failed to consider the effect that terminating his parental rights would have on the Children, and that the court's conclusions were cursory and without supporting evidence. Father's Brief at 40, 43, 45-46. Father argues that the Children are bonded with him, and that the Agency did not present any evidence indicating that the Children "were doing poorly" while in his care or had any major behavioral issues. *Id.* at 44-45.

Our review of the record again supports the findings of the trial court. During the termination hearing, the court heard the testimony of Agency caseworker, Heather Morey. Ms. Morey testified that a court order permits Father to contact the Children by sending them letters and speaking to them on the phone, but only if the Children's trauma therapist deems it "therapeutically appropriate." N.T., 5/15/17, at 33, 36-37. Father sends letters to the Children approximately once every two months, and the therapist presents the letters in the Children. *Id.* at 33-34, 42-43. The Children have also written to Father twice. *Id.* at 39. The therapist has not yet allowed Father to have phone contact with the Children. *Id.* at 40.

Concerning the Children's relationship with Father, Ms. Morey testified that the Children say that they miss Father after receiving his letters, but that it is usually "[L.N.] more than [M.N.] He seems a little too young to

understand." *Id.* at 43, 46-47. The letters have also made the Children upset. *Id.* at 41. Ms. Morey explained that L.N.'s "school had mentioned not to send her back to school after she reads a letter from her father because they had . . . problems with her crying after therapy." *Id.* Based on the Children's reaction to the letters, Ms. Morey opined that the Children have a bond with Father. *Id.* at 46.

Despite this bond, Ms. Morey testified that terminating Father's parental rights would best serve the Children's needs and welfare. *Id.* at 34-35. She based this conclusion on Father's incarceration, his criminal history, and the stability that the Children enjoy in the home of their foster mother, R.L. *Id.* at 35. Ms. Morey visits the Children at their foster home weekly, and "from what I've observed they love it there. They have stability. [R.L.] works with them one on one. She treats them like her own children -- [R.L.] is involved in all of their activities." *Id.* at 31. Ms. Morey opined that the Children and R.L. have "a strong bond." *Id.* at 34.

The trial court also heard from R.L., who testified that she treats the Children like her own biological children, and would like to adopt them. *Id.* at 57. R.L. reported that both she and Mother have spoken to the Children about the possibility of adoption. *Id.* R.L. was initially hesitant to speak to the Children about adoption, but decided to do so after Mother spoke to the Children first. *Id.* R.L. recalled that the Children "reacted well. They keep talking about going to *Disney World* . . . that was their big thing they want to go [t]o *Disney World*." *Id.* at 58 (italics in original). R.L. explained, "they

want to go with mom but they know that that can't happen and so they are okay with the fact that they are staying with me and visiting with her." *Id.* at 64. The Children refer to R.L. as their "step-mom." *Id.* at 57

Thus, the record confirms that terminating Father's parental rights would best serve the Children's needs and welfare. As discussed above, Father is incapable of parenting the Children, and will not be capable at any point in the foreseeable future. While the Children share a bond with Father, their lives cannot remain on hold indefinitely. Moreover, the Children share a bond with their foster mother, R.L. The record indicates that the Children understand and accept that they will remain with R.L., and there is no reason to believe that they will suffer irreparable harm if Father's parental rights are terminated.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by involuntarily terminating Father's parental rights to the Children. Therefore, we affirm the court's June 20, 2017 and June 21, 2017 decrees.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/15/2018

- 13 -